[No. 2653.]

TOM JONES *v.* THE STATE.

1. THEFT — PENALTY. — Ten years confinement in the penitentiary being within the limits of the penalty prescribed by law for horse theft, this court cannot hold it excessive punishment, even though the same jury, upon the same evidence, awarded only five years to a co-defendant who pleaded guilty. See the opinion *in extenso* for an elaboration of the question.

2. SAME—EVIDENCE—CHARGE OF THE COURT.—When necessary to establish identity in developing the *res gestœ*, or in making out the guilt of the accused by circumstances connected with the alleged theft, or to explain the intent with which the accused acted with respect to the property for the theft of which he was being tried, it was competent for the State to prove that other property was stolen at or about the same time and in the same neighborhood from which the property in question was stolen, and that this other property was found in posses sion of the defendant when arrested for the theft of the property for which he was on trial. The purpose of such proof, however, must be explained in the charge of the court.

3. SAME—PRACTICE—JURY LAW.—It is the privilege and the duty of defendants on trial to test the qualifications of jurors before they are placed upon the panel, and the objection that one was a distant relative to the prosecutor is one which comes too late when made for the first time after trial.

4. SAME—FACT CASE.—See evidence which, though circumstantial, is held sufficient to sustain a conviction for horse theft.

APPEAL from the District Court of Travis. Tried below before the Hon. A. S. Walker.

The opinion discloses the nature and result of the prosecution.

J. F. Cameron, the first witness for the State, testified, in substance, that he lived on Onion creek, in Travis county, Texas. On the evening of February 7, 1882, a little after dark, he turned his horses out on the range. The horses included the stallion in question, two geldings and a mare. The geldings and the mare came to the house next morning, but the stallion was missing. Hitherto the stallion had been regular in coming up, and, if left to himself, would always follow the other horses. The witness and Mr. Hamby, who lost a mare about the same time, had notices struck off offering a reward of twenty-five dollars for the recovery of the stallion and the mare. The witness hunted for the animal unsuccessfully throughout his usual range all of the day after his disappearance. The stallion was the property of the witness, and was taken without his knowledge or consent.

After the lapse of about a week the witness recovered his stallion through Mr. Ed. Rousseau, some seven or eight miles off from his usual range. The witness saw the defendants, Jones and Talbot, at Rousseau's. They were there under arrest. He saw Hamby's mare and Moore's saddle at Rousseau's at the same time. Hamby and Moore each lived about one and a half miles distant from the witness.

Cross-examined, the witness stated that Rousseau sent him word that the stallion was at his place, and the witness went and got him. He got the horse on the prairie near Rousseau's house, and took him home without going back by Rousseau's. Rousseau had the brand of the stallion. When the witness caught the stallion at Rousseau's the animal was going in the direction of home. He was very much jaded, and had been ridden or worked down.

Ed. Rousseau testified, for the State, that he lived in the southeast portion of Travis county, some seven or eight miles from Moore's. Hamby came by the house of the witness on the seventh or eighth of February, 1882, and told him of the theft of the animals, and that night he started in pursuit, accompanied by Hamby. They went direct to a camp which had been occupied by the defendant and Talbot, which camp was about two hundred yards from the road, in a prickly pear thicket. Witness was then on foot. He found a fire which had not been used died out, and a dressed rabbit hanging near. Witness and Hamby followed the tracks of a wagon to the road, and witness

then returned to his house, got his horse, and started after the parties. Hamby did not accompany the witness farther.

The witness overtook the parties, of whom there were three, the next night, some fifty or sixty miles distant by the route they traveled, but not over twenty-five or thirty on a line. They were traveling in a one-horse covered spring wagon, and had three horses, saddle, ax, meal, flour, etc. The horses, saddle, ax and meal were claimed by different persons. Cameron claimed and recovered the stallion, Hamby the mare, and Moore the saddle. These parties traveled most of the time off the road, at a distance of one hundred and fifty yards.

When the witness overtook these parties, one of them escaped, and the two defendants were arrested, and, with the horses, were brought back. They left the plunder temporarily at a house in the neighborhood. The witness had no feed, and when he got back, he turned the horses out on the range in care of a boy, and sent Cameron word to come for his stallion. The witness "recovered" the wagon. The track of the wagon went to within three hundred yards of Red Rock, and turned back and traveled about seven miles to a point one and a half miles on a line from Red Rock. The parties traveled in a circuit through a rough country.

Cross-examined, the witness stated that he found two saddles in possession of the party, one of which and one horse were claimed by the defendant Jones. Jones said that he had no claim on either the mare or the stallion, and that they were owned by the man who got away. Talbot made the same statement. No one else has as yet claimed the horse and saddle claimed by Jones. It was Talbot, the witness thought, who told him that he, Talbot, had traded for the wagon. The defendants said that the man who escaped bought and brought the stallion and mare into camp, and had trouble in making payment, etc. Witness did not know which of the horses was ridden by the defendant Jones. The horse Jones claimed had one smooth shoe on a hind foot, and traveled right along with the wagon. Jones would not get on the mare to ride back, after arrest, until compelled by the witness. He said that he had "nothing to do with it." Witness did not know the name of the man who escaped, but understood that it was Pete Talbot. Neither Jones nor Wren Talbot, the defendants here, attempted to escape when arrested. They said that Pete Talbot and defendant Wren Talbot were brothers, and that they got with

Jones at Austin; that Jones and the Talbots were not related. Witness did not know who drove the wagon. Red Rock is thirty-six miles from Austin. These parties were captured some distance off the road. They claimed that defendant Talbot traded a horse for the wagon.

One Porter testified that he traded the hack or wagon to the party who was with the defendants—the man called Pete Talbot. The trade was not made with either of these defendants. The parties were camped, for eight or ten days before the trade, on Onion creek, just back of John Wallace's farm. Witness saw Jones and Pete Talbot together often during that time. Cameron lived below Wallace's, and a quarter or a half mile from the camp; Moore about a mile, and Hamby about a mile and a half. Witness knew of the camp for about ten days before he took the hack down to trade. The horse the witness got for the hack from Pete Talbot, he was told by Pete, was owned by the other Talbot, but that he, Pete, had a right to dispose of him. Witness detected nothing suspicious about the parties during this transaction.

Cross-examined, the witness stated that the trade with him was fair. Some three or four days were spent in negotiation. Jones was with Talbot at the beginning of the trade, and at other times while the trade was pending, but not when the trade was finally closed. When the witness went to the camp for the horse he was introduced to the defendant as the brother of Pete Talbot. The parties told him that another horse at the camp was the property of Jones.

W. H. Hamby, for the State, testified that the camp occupied by the parties before the property was missed was about a half mile from Cameron's and a mile or more from witness's. Witness had not seen the parties for several days when he heard that they had gone. His mare and Cameron's horse were missed about the same time. Witness searched for his animal unsuccessfully all of the next day. He found his field fence pushed apart, and saw the tracks of his mare. He saw the man Pete Talbot on the mare, near night, about two hundred yards to the right of the road, riding towards a camp. Witness saw the fire at this camp that evening, and the top of the hack. This was not the camp on Onion creek. He went to Rousseau's, and they returned to the camp that night. He and Rousseau followed the trail of the wagon to the road. They returned to the house of Rousseau, and Rousseau got his horse and started in pursuit.

Witness saw Rousseau the next Sunday with these defendants in custody, and received his mare from Rousseau. The man Jones staid with the two Talbots at the camp on Onion creek. Jones and Pete Talbot were at the house of the witness several times, together.

Cross-examined, the witness said that he did not swear that these defendants stole his mare. He swore that Pete Talbot did. He saw Pete Talbot on the mare. Pete Talbot and these two defendants were together. Pete Talbot sold the witness a bottle of medicine he called the "Oil of Life," for which the witness paid in chickens. The witness reiterated that he saw Pete Talbot on his mare, but said that he was alone at the time. He saw where the mare was taken through his fence, and saw the track of one man.

Witness trailed his mare about a quarter of a mile, and was afraid to trail farther. He then went in the direction of Webberville. Late that evening, he saw Pete Talbot on his mare, going towards a camp at which witness saw smoke and the top of a hack. This was not the camp on Onion creek, which they had left, but was eight or ten miles from it. Witness did not, of his own knowledge, know that Cameron's horse was stolen on the same night that his was, but heard so. Pete Talbot asked the witness once if he wanted to trade this mare.

Tom Moore testified, for the State, that he had a saddle stolen on the night of February 7, 1882, and recovered it at Rousseau's store. He did not know who stole it.

Mr. Wallace testified, for the defense, that in February, 1882, he lived about nine miles southeast of Austin. He recognized the defendant Talbot as one of a party he saw near his house, but did not recognize Jones. The party of which defendant Talbot was one staid in the neighborhood over four weeks, and, so far as the witness knew, were perfectly orderly. Some one of the party applied to the witness for a house.

The motion for new trial attacked the evidence upon various grounds, and raised the questions discussed in the opinion of the court.

*John Dowell,* for the appellant: Our idea of possession, such as is taken as one of the circumstances of guilt in connection with stolen property, means actual care, control and management of the property. In fact this court has decided such to be the law in the cases of *Crockett* v. *The State,* 5 Texas Court of

Appeals, 528, and *Gaines* v. *The State*, 4 Texas Court of Appeals, 330. Now apply this definition of possession of property to the facts of this case, and where is the evidence showing that appellant was in possession of the horse he is alleged to have stolen?

The witness Rousseau swears he pursued three men with three horses, one hack and harness, and two saddles and bridles. The men were appellant and his co-defendant, on trial in the District Court, named Wren Talbot, and another, who got away at the time of capture, called Pete Talbot. The three horses at this time (because prior to the capture) the witness does not even know; he only knows that one of them is Hamby's mare, and that is all. Hamby informed him to this effect. Does Rousseau for one moment state that appellant Jones had possession of this horse, or who had possession of him? We may suppose he is with the party; in fact, at the capture we actually discover he is; but as to which man rode him, if ridden, or worked him in the hack, if worked, the evidence is entirely silent; and we suppose that that party who so rode or worked the horse had the possession of him, and that he or they who rode in company with him, but on a separate animal, is not *ipso facto* in possession of the horse stolen.

The court sees the danger of such a possession. Every day upon the highway, parties riding different and separate horses meet, and ride or journey together. There is no evidence that these men were partners or joint owners, or joint possessors. The bare fact of these men riding together with these horses, and one of them the stolen horse, is relied on to establish possession of that particular horse by a particular person, this appellant.

This is certainly not sufficient. The State surely ought to be required to show who actually had this horse; that is, who rode him, if ridden, or who worked him to the hack, if worked, or who led him or drove him, if carried in either of these ways. Take Rousseau's evidence at the time of the arrest or capture, and does it for one moment prove the possession of this horse in appellant? Certainly not. The parties when first seen by Rousseau were camped, three men, appellant, Wren Talbot and Pete Talbot being the party. The horses, three in number, were the horse stolen (Cameron's horse), Hamby's mare, and the appellant's horse, and they were grazing off some distance from the camp. All this proves is, that three men were there camped

who had three horses, but as to who and which one of the party had possession of any particular horse, the evidence is entirely silent. We might suppose or conjecture what particular man in the party rode a particular horse; but this will not do. First, it would most surely acquit appellant, and set aside his conviction, because it is most reasonable to suppose that if he had a horse of his own, which he did, he rode this one and none other; and second, this court has repeatedly declared that no defendant can be convicted upon suspicion, however strong, nor on supposition, however plausible, but must be convicted, if at all, upon testimony of such certainty that will not admit of a reasonable doubt.

But, for argument sake, say that the mere fact that Jones was in a company of three men with three horses, two of which were stolen, proves that presumptively Jones was in possession of the stolen one charged in the indictment; yet, does he not explain this presumption away? and is not his explanation, when heard, reasonable and consistent? and does it not establish his innocence? and does not the whole evidence on the trial show his statement, so far as it throws light upon it, to be true and correct? At the time of the arrest by Rousseau, what does he say? Why he then and there declares that he had no claim on the mare (Hamby's mare), or on the stallion (Cameron's horse), the only stolen horses; that the man who got away (Pete Talbot) owned them; that he had no claim on any except his own horse, saddle and bridle. Not only did he say this, which vindicates him in every particular, but when arrested and commanded by Rousseau to get on Hamby's mare and ride back, as he was preparing to return with them, he absolutely refused to do so. In the language of Rousseau himself, which best explains it, "Jones would not get on the mare till I made him; said he had nothing to do with it." We respectfully submit these are not the acts and words of a thief. But further, Rousseau tells us that neither Jones nor Wren Talbot made resistance or effort to escape. Pete Talbot did. Jones and Talbot said that Pete Talbot and Wren Talbot were brothers; that Jones was no kin. Jones had got with them at Austin. Whatever suspicion and doubt the fact of Jones being in the company with the Talbots may cast upon him, yet surely it was removed by his explanation of how he got there, and as to what horse he had possession of. And on this explanation appellant ought to have been acquitted. Not only did the State fail to show it was

false, but every fact in the case supports it. The fact is that Jones had his own horse, saddle and bridle; that it was good property, the title not being questioned. When he stated that the mare, one of the stolen animals, was claimed and owned by Pete Talbot, does not the evidence of Hamby corroborate him? Hamby swears he saw Pete Talbott riding his mare; that one man stole her; that he pursued, and when he saw her next Pete Talbot was riding her.

The next point we present is: The verdict, as to appellant Tom Jones, shows upon its face to be excessive and oppressive and unjust, in this, that the said verdict, upon the same evidence, supported by a plea of guilty, assesses five years imprisonment upon Wren Talbot and ten years upon appellant Tom Jones, who pleaded not guilty; and is inconsistent with justice, and shows, in the very mention of it, that the jury, from the mere fact that appellant Tom Jones pleaded not guilty and defended himself, placed upon him five years additional punishment. It is manifest from this verdict that the jury were influenced by considerations outside of the evidence and law of the case.

Appellant and his co-defendant were placed upon trial at the same time, before the same jury, by the same court, and with the same evidence. Appellant pleaded not guilty and defended himself; his co-defendant pleaded guilty. The jury, under the charge of the court, go out and return a verdict of ten years against appellant and five years imprisonment against his co-defendant, in the penitentiary.

Why this distinction and difference in the terms of the punishment between the parties, no one can tell, except that the jury designed to punish appellant for defending himself before them, or from the fact that a relation of the prosecutor was accidentally upon the jury. We know that it is averse to the enunciated rulings of this court to invade the province of the jury and set aside their verdict upon slight and immaterial causes; but where the verdict of the jury is so radically wrong and unjust and oppressive as in this case, it does seem to us that it is possible for a party to be convicted and deprived of his life or his liberty without due course of the law of the land, unless it is done.

The verdict of the jury should represent something in the evidence, and we ask this court, what is it, either in the evidence or on the trial, that the additional punishment imposed by the jury upon appellant is intended to represent? Is it be-

cause he pleaded not guilty? Surely, if for this, he exercised a legal right. Is it because he defended himself, introducing evidence, and was assisted by counsel? Certainly in these, if they be the causes, he is protected and shielded by the very fundamental principles of our law; and, if not for these, was it on account of anything in the evidence that called upon the jury to recognize such a difference in the cases of the two? In fact, the party who pleaded guilty appeared by counsel, introduced evidence, and, though pleading guilty, defended himself under his plea by introducing evidence to grade his term of punishment. In fact, when looked into, the only difference in the two cases is that one pleaded guilty and the other not; and we do not believe this court or any other will say that a plea of this character will support a verdict of five years additional term of imprisonment in the penitentiary. In fact, if any distinction should be made at all, it ought to be in favor of appelpellant. A man proclaiming his innocence, and fighting for the truth of his assertion, ought to meet with compassion in all good men's eyes; for surely this is the only way innocent men express themselves. But to this jury it seems such was not only as sounding brass and tinkling cymbal, but the sure and certain evidence of deep and outrageous guilt.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Appellant Tom Jones and one Wren Talbot were jointly indicted for the theft of a horse, the property of one J. T. Cameron. When the case was reached on the docket for trial they both appeared, in person and by attortorney, and announced ready for trial, the defendant Wren Talbot pleading guilty, and appellant Tom Jones pleading not guilty, no severance being had or applied for. After hearing the evidence, argument of counsel and charge of the court, the jury returned a verdict of guilty as to both defendants, affixing the punishment of Talbot, who had pleaded guilty, at five years imprisonment in the penitentiary, and the punishment of Jones, who had pleaded not guilty, at imprisonment in the penitentiary for ten years. Judgment was rendered in accordance with this verdict, and Jones appeals.

One of the main grounds earnestly argued and insisted upon, as a reason why the verdict and judgment should be set aside, is the difference made by the jury in the punishment they have

assessed, the evidence being the same, and the only difference in the two cases being that the one pleaded guilty, the other not guilty. It is substantially insisted that, supposing for argument's sake both to be guilty, the verdict upon its face is inequitable, unjust and excessive as to Jones, who, under the evidence, was deserving of no more or greater punishment than his co-defendant Talbot; that this excessive punishment must have been imposed by the jury from mere wantonness or caprice, as an additional infliction upon Jones, solely because of his persistent contumacy in exercising one of the inalienable rights of a citizen to declare and defend his innocence when charged with crime; and that a party has not entirely forfeited his right to mercy by protesting his innocence, even though he may be conscious of his guilt.

This position is quite plausible, and while the written argument of counsel in support of it is as persuasive as it is ingenious, we are unable to see how we are authorized to consider the question, much less declare it a reversible error. It may be true that the jury felt outraged that Jones should, in the face of the evidence, deny his guilt and use all the means and appliances furnished by the law to try and establish his plea, or at all events to create in their minds a reasonable doubt as to his guilt; and this feeling may have induced them to slack the mercy in his case, which they were willing to extend to the penitent Talbot; this, we say, may be true. But with that we have no concern. Jones took these chances when he made his fight. With us the only question as to the punishment is, did it exceed the limits prescribed by law? Being compelled to answer in the negative, we cannot say the punishment was unjust, inequitable or excessive, no matter what the motives which induced its infliction.

But we are urged to reverse the case upon other grounds. One is that proof was permitted to be made, over objection, that other horses and property were stolen at or about the same time, and in the same neighborhood from which Cameron's horse, the one in question, was stolen; and further, to prove that these other horses and property were found in possession of the parties when they were arrested for the theft of Cameron's horse. As necessary, or, rather, when necessary, to establish identity, in developing the *res gestæ*, or in making out the guilt of the accused by circumstances connected with the alleged theft, or to explain the intent with which the accused may have acted,

such evidnece is always admitted. (*Gilbraith* v. *The State*, 41 Texas, 567; *Davidson* v. *The State*, 12 Texas Ct. App., 215.) Moreover, this evidence was carefully guarded and properly limited by the court in the tenth paragraph of the charge, wherein the jury were told: "The defendant is on trial for the theft of Cameron's horse, and they will give no attention to the testimony about the Hamby mare and Moore's saddle as evidence to show the theft of the horse. The testimony can be considered only by the jury for what they may deem it worth as tending to show the intent of the defendant Jones in whatever actions they may find from the evidence were done by him."

With regard to the other portions of the charge, we have only to say that, when considered in connection with the requested instructions which were given, it fully, sufficiently and explicitly submitted the questions of law necessary to be understood and determined in relation to the facts, and the supposed objections to it are untenable.

The only remaining question, outside the sufficiency of the evidence, is as to the juror Cameron, who was a distant relative to the prosecutor. Suffice it to say, as to this objection, it was the duty as well as the privilege of defendant to thoroughly test the qualifications of the jurors before accepting them, and, if he failed to do so, the fault is his own; and if he did so, and then took the juror, the fault is also his own. At all events, this objection to the juror might, could and should have been ascertained before he was placed upon the panel, and if by accepting him defendant committed an oversight or failed to use diligence, in either case he has not shown that he was in any way specially injured thereby. But such an objection comes too late after trial.

As to the sufficiency of the evidence in establishing defendant's guilty complicity in the crime, whilst it is wholly circumstantial, it is, in our opinion, none the less conclusive. In our opinion, no other reasonable hypothesis than that of his guilt could well have been the result of the evidence as shown by this record.

We have given the case a full and careful consideration, and finding no cause for the reversal of the judgment, it is affirmed.

*Affirmed.*

Opinion delivered April 25, 1883.